AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20) ☐ Original ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the
Central District of California

FILED
CLERK, U.S. DISTRICT COURT
5/6/2026
CENTRAL DISTRICT OF CALIFORNIA
BY: ts DEPUTY

United States of America,

v.

Tomas Pablo Herrera,

Defendant.

Case No. 2:26-mj-02728-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of March 10, 2026, in the county of Los Angeles in the Central District of California, the defendant violated:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with the Intent to Distribute, and Distribution of, a Controlled Substance |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/
*Complainant's signature*

Brent Ramos, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: May 6, 2026 at 8:15pm

*Judge's signature*

City and state: Los Angeles, California

Stephanie S. Christensen, U.S. Magistrate Judge
*Printed name and title*

AUSAs: Lauren E. Border / Joshua J. Lee x3183

# AFFIDAVIT

I, Brent Ramos, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint against Tomas Pablo HERRERA ("HERRERA"),[1] charging him with violating 21 U.S.C. § 841(a)(1) (Possession with the Intent to Distribute, and Distribution of, a Controlled Substance).

2. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show that there is sufficient probable cause for the requested complaints and warrants and does not purport to set forth all my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

3. I am a Special Agent with the Drug Enforcement Administration ("DEA"), and I have served as a Special Agent since July 2021. To become a Special Agent, I completed a 16-

[1] The Honorable Stephanie S. Christensen issued a criminal complaint against 24 defendants on May 1, 2026, under case no. 2:26-MJ-02611. The affidavit supporting that criminal complaint contained 25 defendants, including HERRERA, and the Honorable Stephanie S. Christensen issued 25 arrest warrants for all 25 defendants, including HERRERA. HERRERA, however, was inadvertently left out of the cover page of the criminal complaint. As such, this complaint is being filed as a standalone complaint against HERRERA, thereby correcting the error. The affidavit is substantively the same.

week course in Quantico, Virginia, which involved specialized trainings on topics including, but not limited to, drug interdiction, money laundering techniques and schemes, smuggling, financial investigations, controlled substance identification, physical and electronic surveillance, confidential source management, undercover operations, and the investigation of individuals and organizations involved in the smuggling, cultivation, manufacturing, and trafficking of controlled substances.

4. I am currently assigned to the DEA High Intensity Drug Trafficking Area ("HIDTA") group, in Los Angeles, California, which is tasked with investigating large-scale drug trafficking and money laundering organizations domestically.

5. I have participated in numerous drug trafficking investigations, and I have also spoken with defendants as well as confidential informants regarding the possession, sale and distribution of illegal substances. In conducting these drug trafficking investigations, I have utilized a variety of investigative techniques and resources, including physical and electronic surveillance, and various types of informants and cooperating sources. Through the above-mentioned investigations, my training and experience, and conversations with other experienced agents and law enforcement personnel, I have become familiar with the methods used by drug traffickers to smuggle and safeguard drugs, distribute drugs, and to collect and launder illicit drug-related proceeds.

## III. SUMMARY OF PROBABLE CAUSE

6. Beginning in March 2026, the DEA HIDTA, working with the Los Angeles Police Department ("LAPD") Rampart Division and the Los Angeles County Sheriff's Department ("LASD"), initiated an investigation into the trafficking of controlled substances occurring in and around MacArthur Park, for the purpose of identifying distributors, gathering evidence, and charging distributors and sources of supply of drugs. This investigation was conducted through multiple methods of surveillance, including the use of buy/walk operations[2] and the strategic use of uniformed officers to conduct stops of TARGETS after the buy/walks to identify them. Confidential sources ("CS") and undercover law enforcement officers ("UC") were used to conduct the buy/walk operations.

7. Below is a summary table of the buy/walk operations and seizures conducted since March 9, 2026:

| Date | Target Name | Transaction Amount | Drug Testing Results | CS/UC used | Pages |
|---|---|---|---|---|---|
| 3/9/26 | JARAMILLO | $20 | 1.74 net grams of methamphetamine, with 100% purity | CS-1 | 26-28 |
| 3/10/26 | HERRERA | $30 | 0.382 net grams of a mixture containing fentanyl; 0.98 net grams of methamphetamine, with 100% purity | CS-1 | 38-39 |
| 3/12/26 | GARCIA-GOMEZ | $40 | 0.752 net grams of a mixture | CS-2 | 39-40 |

[2] A buy/walk operation is an undercover law enforcement tactic where an undercover officer or confidential informant purchases illegal drugs from a suspect but does not immediately arrest them.

| | | | | | |
|---|---|---|---|---|---|
| | | | containing fentanyl | | |
| 3/13/26 | GARCIA-GOMEZ | $40 | 0.728 net grams of a mixture containing fentanyl | CS-2 | 40-41 |
| 3/14/26 | PALUCHA | $40 | 0.709 net grams of a mixture containing fentanyl | CS-2 | 41-42 |
| 3/14/26 | FINDEIS | $40 | 0.426 net grams of a mixture containing fentanyl | CS-2 | 42-43 |
| 3/15/26 | JARAMILLO | $40 | 0.692 net grams of a mixture containing fentanyl | CS-2 | 28-29 |
| 3/16/26 | JARAMILLO | $20 | 0.373 net grams of a mixture containing fentanyl | CS-3 | 29-30 |
| 3/17/26 | FLORES-CASTRO | $10 | 0.235 net grams of a mixture containing fentanyl | CS-1 | 34-35 |
| 3/18/26 | JARAMILLO | $10 | 0.278 net grams of a mixture containing fentanyl | CS-1 | 30-33 |
| 3/19/26 | THIGPEN | $40 | 4.16 grams of pure methamphetamine (4.25 net grams with 98% purity) | CS-4 | 43-44 |
| 3/20/26 | FLORES-CASTRO | $40 | 0.695 net grams of a mixture containing fentanyl | CS-2 | 35 |
| 3/23/26 | MORONES | $10 | 0.25 net grams of a mixture containing fentanyl | CS-3 | 44-45 |
| 3/27/26 | CANELO | $20 | 0.15 net grams of a mixture containing fentanyl | CS-3 | 45-46 |
| 3/29/26 | GONZALEZ-GONZALEZ | $20 | 0.33 net grams of a mixture containing fentanyl | CS-3 | 36-38 |
| 3/29/26 | BARRETO-RIOS | $20 | 1.687 grams of pure | CS-3 | 36-38 |

| | | | | | |
|---|---|---|---|---|---|
| | | | methamphetamine (1.705 net grams with 99% purity) | | |
| 3/31/26 | MORENO-LOPEZ; TARFUR; MORALES-LANDEL | Sourced | 498.1 net grams of a mixture containing fentanyl; 439.7 net grams of methamphetamine, with 100% purity | N/A | 17-19 |
| 4/1/26 | ORELLANA-GARCIA | $40 | 0.72 net grams of a mixture containing fentanyl | CS-1 | 46-48 |
| 4/2/26 | SOLANO | $60 | 1.33 net grams of a mixture containing fentanyl | CS-1 | 48 |
| 4/3/26 | MCDANIEL | $40 | 0.322 grams of pure methamphetamine (0.329 net grams with 98% purity) | CS-2 | 49 |
| 4/3/26 | JIMENEZ-CABARICO | $40 | 0.675 net grams of a mixture containing fentanyl | CS-2 | 49-50 |
| 4/6/26 | ZAVALA | $70 | 0.96 net grams of a mixture containing fentanyl | CS-3 | 50-51 |
| 4/9/26 | TAPIA; JARAMILLO | $40 | 0.246 net grams of a mixture containing fentanyl | CS-2 | 51-52 |
| 4/14/26 | IRIARTE-AVILA | Sourced | 443.80 net grams of methamphetamine[3] | N/A | 24-26 |
| 4/15/26 | HARRIS | $30 | 0.087 net grams of methamphetamine | UC-1 | 52-53 |
| 4/15/26 | JACKSON; MEDINA | $20 | 0.403 grams of pure methamphetamine (0.416 net grams with 97% purity) | UC-2 | |
| 4/15/26 | ZUNIGA | $20 | 0.215 grams of pure | UC-3 | 54-55 |

[3] The LAPD drug laboratory conducted a Fourier-Transform Infrared Spectroscopy test to confirm that the substance contained a net weight of 443.80 grams of methamphetamine. Purity level was not tested.

| | | | | | |
|---|---|---|---|---|---|
| | | | methamphetamine (0.220 net grams with 98% purity) | | |

8. In addition to the buy/walk operations, during the course of this investigation, investigators discovered that Mallaly MORENO-LOPEZ ("MORENO-LOPEZ"), and her boyfriend Jackson TARFUR ("TARFUR"), serve as the, if not one of the main sources of supply of fentanyl powder and methamphetamine distributed in the Alvarado Corridor and MacArthur Park, generally on behalf of the 18th Street Gang. Intelligence, surveillance, and operations to-date indicate that MORENO-LOPEZ and TARFUR hand-deliver narcotics to the Alvarado Corridor for stashing in the storefronts and subsequent distribution to street-level dealers. It is believed that MORENO-LOPEZ and TARFUR utilize their residence, **SUBJECT PREMISES 1**, as a stash location for their narcotics, prior to delivering them to MacArthur Park. Additionally, investigators identified Yolanda IRIARTE-AVILA ("IRIARTE-AVILA") as a source of supply of methamphetamine for MORENO-LOPEZ, via her boyfriend Jesus MORALES-LANDEL ("MORALES-LANDEL"), who is a street-level dealer on the Alvarado Corridor. Surveillance and enforcement operations suggest that IRIARTE-AVILA utilizes her residence, **SUBJECT PREMISES 2**, as a stash location for subsequent distribution.

## IV. STATEMENT OF PROBABLE CAUSE

9. Based on my review of video and audio recordings of controlled buys pertinent to this investigation, other

undercover video and audio recordings,[4] review of law enforcement reports, and conversations with law enforcement agents present during the controlled buys and/or surveillance, as well as my own personal knowledge of the investigation, I am aware of the following:

**A. Background on MacArthur Park**

10. MacArthur Park is located in the city of Los Angeles, California. It is operated by the Los Angeles City Department of Recreation and Parks. MacArthur Park is in a sector of the city characterized by high rates of poverty and homelessness. Many of the homeless in the area are drug users, and MacArthur Park is a known location to purchase user quantities of drugs, including methamphetamine and fentanyl.

11. Wilshire Boulevard bisects the park from east to west, and the following streets serve as the park's borders:

a. 6th Street runs from southeast to northwest, serving as the northern border of the park;

b. 7th Street runs from southeast to northwest, serving as the southern border of the park;

c. South Park View Street runs from southwest to northeast, serving as the western border of the park; and

[4] Some of the recordings referenced and relied upon herein were conducted in whole or in part in the Spanish language. For such recordings that contain substantial Spanish language that are relied upon herein, a Spanish speaking agent listened to the recording and communicated a summary of the English translation of the substance of such recorded communication to me or fellow agent or officer, who, in turn, communicated the substance of the recorded communication to me.

d. Alvarado Street runs from southwest to northeast, serving as the eastern border of the park.




12. A variety of shops, restaurants, mobile phone stores, hotels, apartments, and offices surround the park. Individual apartment buildings and businesses generally border MacArthur Park on the northern, western, and southern streets. The eastern side of MacArthur Park -- Alvarado Street -- is characterized by more tightly-packed buildings and businesses, specifically between Wilshire Boulevard and 6th Street. This strip of Alvarado Street is known as "Alvarado Corridor":



13. The Alvarado Corridor features a row of closely spaced small shops, along with a smaller set of businesses positioned farther back from the sidewalk. South of the corridor is the Westlake/MacArthur Park Los Angeles Metro Station stop.

14. MacArthur Park and the immediate surrounding area are part of heavily contested gang territory. North of Wilshire Boulevard and east of Park View Street are considered territory of the 18th Street Gang, which includes the Alvarado Corridor. South of Wilshire Boulevard is considered territory of the Crazy Riders Gang, and west of Park View Street is considered MS-13 territory:




15. The three gangs are responsible for sourcing drugs to be distributed in the vicinity of MacArthur Park. Each gang levies taxes[5] on specific businesses in MacArthur Park. Gang members rarely, if ever, are responsible for the actual sale of the user-quantities of drugs. Rather, they are responsible for sourcing kilogram to multi-kilogram quantities in the area and distributing ounce quantities to "runners" that resupply the actual sellers doing hand-to-hand transactions on the street. This operation allows multiple layers of insulation between the gang and sources of supply, and sellers on the street. Sellers

[5] Businesses operating in gang-owned territories typically are required to pay a percentage of their revenue to the gang for protection from rival gangs.

are most often undocumented persons from Central and South America. Powdered fentanyl is the most common drug sold, followed by methamphetamine.

16. MacArthur Park is easily accessible by multiple methods of public transportation, including the bus and subway. As a result, it is easy to access for the homeless population and drug users. Recognizing this, gangs utilize the Alvarado Corridor in MacArthur Park as the hub and focal point for user-quantity distribution of fentanyl and methamphetamine in the area. As a result of the high degree of foot traffic, consisting of both the homeless population and tourists, street-level dealers are able to hide in plain sight and conduct surreptitious hand-to-hand drug transactions in the Alvarado Corridor. Users will walk up to a street-level dealer, pay them $20 or $40, and receive a small user quantity of fentanyl or methamphetamine.





17. There have been multiple attempts to remedy the hub of narcotics trafficking and selling in MacArthur Park, but it continues to operate as an open-air drug market.

**B. Targets 1-3: MORENO-LOPEZ / TARFUR / MORALES-LANDEL**

1. March 20, 2026: Initial Identification of MORENO-LOPEZ and TARFUR

18. On March 20, 2026, as further described in paragraphs 74 through 76, DEA investigators conducted a controlled buy from Juan FLORES-CASTRO ("FLORES-CASTRO") in the Alvarado Corridor in front of the business "El Paraiso." Following the buy, investigators conducted surveillance of FLORES-CASTRO. Investigators saw FLORES-CASTRO walk north on Alvardo Street to the Ross department store located at 420 South Alvarado Street. FLORES-CASTRO entered a gray Toyota Camry bearing California License Plate 8XUU903 ("gray Toyota Camry")[6] and drove to the McDonald's parking lot located at 405 North Alvarado Street.

19. FLORES-CASTRO parked next to a white Toyota Camry bearing California License Plate 8AUG901 ("white Toyota Camry")[7] and entered it. Shortly after, FLORES-CASTRO exited the white Toyota Camry with a visible bulge in the front pocket of FLORES-CASTRO's black hoodie. The bulge was not present prior to FLORES-CASTRO entering the white Toyota Camry.

20. Law enforcement maintained surveillance of the white Toyota Camry. Through comparison of photos taken during surveillance that day, MORENO-LOPEZ's driver's license photo, and a previous booking photo of TARFUR, investigators identified the driver and passenger as MORENO-LOPEZ and TARFUR. Law

---

[6] Based on law enforcement databases, this car is registered to a towing business located in Compton, California.

[7] Based on law enforcement databases, this car is registered to M.L. at a residence in Pico Rivera, California.

enforcement was also previously aware of MORENO-LOPEZ and TARFUR because they had been arrested and booked following the execution of a search warrant at their previous residence, located at 3327 East 4th Street in Los Angeles, during an FBI operation, which uncovered several kilograms of controlled substances, including fentanyl, methamphetamine, and Xanax, on March 4, 2026.

2. March 23, 2026: Surveillance of TARFUR in El Paraiso

21. On March 23, 2026, investigators observed the white Toyota Camry, driven by TARFUR, park in front of El Paraiso. Investigators saw TARFUR exit the driver's side door empty-handed and walk into El Paraiso. Seconds later, investigators saw TARFUR exit El Paraiso carrying two orange plastic bags that appeared to be weighted and re-enter the driver's door of the white Toyota Camry and drive away. Mobile surveillance of TARFUR was attempted but the vehicle was lost traveling west on Wilshire Boulevard.






3. <u>March 29, 2026: Surveillance of MORALES-LANDEL, MORENO-LOPEZ, and TARFUR in the Alvarado Corridor</u>

22. On March 29, 2026, investigators conducted two controlled buys in the vicinity of the Alvarado Corridor.

Following the buys, law enforcement maintained surveillance on the corridor.

23. Later that day, investigators positioned at the Ross department store at 420 South Alvarado Street saw MORALES-LANDEL[8] exit a blue Chevrolet Volt bearing California License Plate 8KIZ032 (the "blue Chevrolet Volt")[9] and walk south on Alvarado Street. A few minutes later, MORALES-LANDEL met with Felix BARRETO-RIOS ("BARRETO-RIOS")[10] outside El Paraiso before investigators saw both BARRETO-RIOS and MORALES-LANDEL conduct multiple hand-to-hand transactions of drug sales to users, whereby an individual handed the dealer money and the dealer handed the individual a small bag or quantity of a white substance. Following approximately 90 minutes of suspected drug dealing on the Alvarado Corridor, MORALES-LANDEL walked north on Alvarado Street, re-entered his blue Chevrolet Volt, and left the area.

24. Later, investigators saw the white Toyota Camry -- being driven by MORALES-LANDEL -- park in the same Ross parking lot located at 420 South Alvarado Street. MORALES-LANDEL and TARFUR exited the white Toyota Camry and walked south on Alvarado Street into the Alvarado Corridor, each carrying a

[8] As elaborated in paragraphs 55 through 56, MORALES-LANDEL was originally identified on March 9, 2026 in connection with a purchase of fentanyl from JARAMILLO.

[9] Based on law enforcement databases, this car is registered to an individual bearing the initials C.M. at an apartment complex in Northridge, California.

[10] On April 21, 2026, during a surveillance operation, officers stopped BARRETO-RIOS and confirmed his identity based on a prior booking photograph LAPD had of him.

weighted blue fabric bag. Both subjects entered El Paraiso and disappeared from view. Later, MORENO-LOPEZ exited El Paraiso carrying a weighted bag, walking with an Unidentified Hispanic Female ("UHF-1"). MORENO-LOPEZ and the UHF-1 walked north on Alvarado Street and up to the shopfronts located over El Paraiso. Investigators saw UHF-1 appear to unlock the door of the business with the characters "106-C" listed above the door and enter with MORENO-LOPEZ. Both individuals remained inside for approximately an hour, after which investigators saw both individuals exit Suite 106-C empty-handed and return to El Paraiso.

4. <u>March 31, 2026: Seizure of Fentanyl and Methamphetamine from MORENO-LOPEZ and TARFUR</u>

25. On March 31, 2026, investigators established surveillance at 1334 West 93rd Street, Los Angeles, California, i.e., **SUBJECT PREMISES 1**, a known residence[11] of MORENO-LOPEZ and TARFUR. Shortly after, investigators saw MORENO-LOPEZ and TARFUR leave **SUBJECT PREMISES 1** in the white Toyota Camry. Investigators maintained surveillance on MORENO-LOPEZ and TARFUR as they traveled around Los Angeles in the white Toyota Camry.

26. Later that evening, as witnessed by investigators, the white Toyota Camry parked in the parking lot of the Food4Less grocery store located at 1748 West Jefferson Boulevard, Los Angeles, California. Investigators saw MORENO-

[11] After initially identifying MORENO-LOPEZ and TARFUR, investigators conducted periodic surveillance. During this time, they saw both individuals regularly arriving at and departing from **SUBJECT PREMISES 1** in a manner consistent with it being their primary residence.

LOPEZ and TARFUR exit their car and walk toward the Food4Less. Approximately 20 minutes later, investigators saw MORALES-LANDEL walk toward the white Toyota Camry carrying a brown Nike paper bag while appearing to be on the phone.

27. Moments later, MORALES-LANDEL walked into the Food4Less with the brown Nike paper bag. Inside the Food4Less, MORALES-LANDEL met with MORENO-LOPEZ and TARFUR. MORALES-LANDEL handed TARFUR the brown Nike paper bag, which TARFUR then placed into the shopping cart used by MORENO-LOPEZ and TARFUR.[12] MORALES-LANDEL then pushed the shopping cart and walked with MORENO-LOPEZ and TARFUR toward the white Toyota Camry. Once at the white Toyota Camry, TARFUR placed the items from the shopping cart, including the brown Nike paper bag, into the trunk. MORENO-LOPEZ, TARFUR, and MORALES-LANDEL then entered the white Toyota Camry and departed the Food4Less.

28. Investigators then saw the white Toyota Camry stop near 1608 West 35th Place in Los Angeles. MORALES-LANDEL exited the car and walked toward the apartment building located at that address, as the white Toyota Camry departed. Shortly after, LAPD conducted a stop on the white Toyota Camry, which was driven by TARFUR, based on probable cause that there were drugs in the car.[13] During the stop, LAPD searched the vehicle. Inside the trunk, officers recovered the brown Nike paper bag. The Nike paper bag contained a white brick-shaped powdery substance of

---

[12] The actions described in Food4Less were captured on video surveillance footage obtained via a subpoena.

[13] TARFUR was on probation for a previous narcotics charge and subject to search by law enforcement.

suspected fentanyl, and a clear bag of a white crystalline substance suspected to be methamphetamine.

29. On April 28, 2026, DEA laboratory testing confirmed that the substances inside the Nike paper bag were approximately 498.1 net grams of a mixture and substance containing fentanyl, and 439.7 net grams of methamphetamine, with a 100% level of purity.

5. April 17, 2026: Surveillance of MORENO-LOPEZ and TARFUR Supplying Drugs to the Corridor

30. On April 17, 2026, DEA investigators established surveillance in the vicinity of the Alvarado Corridor, for the purpose of conducting surveillance of MORENO-LOPEZ and TARFUR. That evening, investigators established surveillance around El Paraiso. Investigators saw MORENO-LOPEZ and TARFUR in the vicinity of El Paraiso as they were walking in and out of El Paraiso. MORENO-LOPEZ then exited El Paraiso empty-handed and walked north on Alvarado Street to a white Jeep Wrangler, bearing California license plate no. 8CPZ448 (the "White Jeep").[14]

31. MORENO-LOPEZ then went to the back of the White Jeep and unloaded a foldable black shopping cart and loaded the cart with about eight large paper bags from the White Jeep. She wheeled the cart and brought the cart to Suite 106C; she then unlocked Suite 106C and went inside with the shopping cart and paper bags. For about 20 minutes, she walked in and out of Suite 106C empty-handed.

[14] According to law enforcement databases, the White Jeep is registered to MORENO-LOPEZ.

32. Later, she carried one of the brown paper bags and brought it inside El Paraiso. A few minutes later, investigators saw a visible increase in hand-to-hand transactions near El Paraiso. Investigators then saw MORENO-LOPEZ and TARFUR, who were inside El Paraiso, hand zip lock baggies to about four unidentified individuals who were working at and standing behind the counter of El Paraiso, and the unidentified individuals were stashing the baggies in a plastic bin behind the counter of El Paraiso. The unidentified individuals then supplied what appeared to be user quantities of drugs to drug sellers outside of El Paraiso.

33. Throughout the night, MORENO-LOPEZ and TARFUR stood in the middle section of El Paraiso, looking towards the front of the store, observing all hand-to-hand transactions occurring, and making sure to deliver additional clear plastic baggies to the front when needed. Later that evening, MORENO-LOPEZ and TARFUR emerged from El Paraiso and walked north on Alvarado Street to the second floor, above Suite 106C, several times. MORENO-LOPEZ carried bags out of El Paraiso and used a key to unlock Suite 106C. MORENO-LOPEZ then carried the bags into Suite 106C.

34. Surveillance was maintained on MORENO-LOPEZ and TARFUR. They both left El Paraiso, with TARFUR carrying a weighted brown paper bag. MORENO-LOPEZ and TARFUR then returned to **SUBJECT PREMISES 1**. They were carrying two bags, each retrieved from their vehicle, and walked into **SUBJECT PREMISES 1**.

35. Based on my training, experience, and knowledge of this investigation to-date, I believe that MORENO-LOPEZ and TARFUR personally resupply the street-level dealers conducting hand-to-hand narcotics sales in MacArthur Park, based on (1) the seizure event on March 31, 2026, indicating that MORENO-LOPEZ and TARFUR receive larger-sized quantities of fentanyl powder and pound-sized quantities of methamphetamine, and (2) the surveillance conducted on April 17, 2026, where MORENO-LOPEZ and TARFUR were resupplying the street-level dealers with what appeared to be drugs for distribution. I believe that MORENO-LOPEZ and TARFUR deliver the larger quantities of drugs personally and transport it from **SUBJECT PREMISES 1** and carry bags concealing the drugs from their car into El Paraiso and Suite 106C for subsequent distribution.

### C. Target 4: IRIARTE-AVILA

#### 1. Identification of IRIARTE-AVILA

36. On February 19, 2026, as part of a separate DEA HIDTA investigation, IRIARTE-AVILA sold approximately one kilogram of fentanyl powder to a DEA confidential source[15] in Sherman Oaks, California for $10,000. During the course of this investigation,

[15] This confidential source is a Mexican national who began working for DEA in 2013 after being convicted of possession of marijuana for sale and illegal re-entry into the United States. The source works for the DEA in exchange for financial compensation, deferred action on his/her immigration status, and for permission to enter and remain in the United States. Since 2013, the source has been paid approximately $1,662,541 for information. Since 2013, the source has assisted in the seizure of thousands of pounds of drugs and millions of dollars in drug proceeds. The source has not made any false statements to me or any other law enforcement agent. His/her information has been corroborated through independent evidence.

on February 17, 2026, the Honorable Teresa Sullivan, Superior Court Judge for the State of California, County of Los Angeles, authorized a cell-site warrant for phone number (818) 259-5527 (the "IRIARTE-AVILA PHONE").[16] Responsive location data revealed that the IRIARTE-AVILA PHONE consistently spent sleeping hours in the vicinity of the **SUBJECT PREMISES 2** apartment complex, and law enforcement twice personally saw IRIARTE-AVILA enter **SUBJECT PREMISES 2**. From this, law enforcement believes **SUBJECT PREMISES 2** is IRIARTE-AVILA's residence.

2. April 2, 2026: Arrest of MORALES-LANDEL and Tracker Installation on his Blue Chevrolet Volt

37. During the course of this investigation, law enforcement discovered MORALES-LANDEL was the subject of an active Los Angeles County arrest warrant for drug sales. Law enforcement thus decided to locate a car associated to MORALES-LANDEL, namely, a blue Chevrolet Volt, and install a tracker.

38. Accordingly, on April 2, 2026, DEA and LAPD investigators conducted surveillance of the blue Chevrolet Volt, for the purpose of installing a vehicle tracker.[17] The blue Chevrolet Volt was located in a carport of the residence MORALES-LANDEL was walking towards on March 31, 2026, i.e., 1608 West 35th Place, Los Angeles, as described above. Surveillance

---

[16] On March 17, 2026, the Honorable Thomas Griego of the Superior Court of California, County of Los Angeles, extended the cell-site warrant for another 30 days.

[17] The warrant authorizing the installation of a tracker warrant was issued on April 2, 2026 by the Honorable Thomas Griego, Judge of the Superior Court of the State of California, County of Los Angeles. The tracker warrant expires on May 2, 2026.

of the blue Chevrolet Volt was conducted and investigators saw MORALES-LANDEL driving the car. Later that day, given MORALES-LANDEL's active arrest warrant, LAPD conducted a motor vehicle stop on the blue Chevrolet volt in the vicinity of 1567 West Jefferson Boulevard in Los Angeles. Officers arrested MORALES-LANDEL pursuant to the Los Angeles County arrest warrant, and the blue Chevrolet Volt was left parked curbside at the location of the traffic stop. Investigators installed the vehicle tracker while the blue Chevrolet Volt was left parked curbside at this location on April 2, 2026.

3. Relationship Between MORALES-LANDEL and IRIARTE-AVILA Is Established

39. Pursuant to MORALES-LANDEL's arrest, law enforcement seized his phone with the number (323) 424-9086 (the "MORALES-LANDEL PHONE"). As noted above, a cell-site warrant had been issued for the IRIARTE-AVILA PHONE on February 17, 2026. Toll analysis of both phones revealed there were approximately 150 contacts between the two phones over the 30-day interval of the tolls between February 17, 2026 and March 17, 2026.

40. Vehicle tracker data from the blue Chevrolet Volt revealed it remained curbside at the traffic stop location on 1567 West Jefferson Boulevard from April 2, 2026 through April 12, 2026. On April 12, 2026, at approximately 9:00 p.m., the vehicle tracker data showed the blue Chevrolet Volt leave that location. Approximately an hour later, the vehicle tracker stopped moving in the vicinity of **SUBJECT PREMISES 2**. The vehicle tracker data showed that the blue Chevrolet Volt

remained parked in the vicinity of **SUBJECT PREMISES 2** to this date.

#### 4. Seizure of 443.80 Net Grams of Methamphetamine from J.V.C., Sourced by IRIARTE-AVILA

41. On April 14, 2026, DEA investigators established surveillance at **SUBJECT PREMISES 2.** Later that evening, IRIARTE-AVILA arrived at **SUBJECT PREMISES 2**, parked in stall number 837 in a black Honda bearing California License Plate 9VHS674,[18] exited the car, and entered **SUBJECT PREMISES 2.**

42. Shortly after, investigators saw a gray BMW bearing California temporary paper plate EN33R77 (the "gray BMW")[19] park in spot 836 at **SUBJECT PREMISES 2.** Following this, an Unidentified Male ("UM-1") and two Unidentified Females ("UF-1" and "UF-2") left the gray BMW and entered **SUBJECT PREMISES 2.** Moments later, investigators saw IRIARTE-AVILA and UM-1 exit **SUBJECT PREMISES 2** and enter the gray BMW. Mobile surveillance was conducted, and after a short follow of the gray BMW away from **SUBJECT PREMISES 2**, investigators saw the gray BMW return to **SUBJECT PREMISES 2.** IRIARTE-AVILA then exited the gray BMW, entered **SUBJECT PREMISES 2** briefly, and exited **SUBJECT PREMISES 2** again moments later wearing a sweater that appeared to be bulky and contain something in the pocket area. IRIARTE-AVILA re-entered the passenger seat of the gray BMW before the gray BMW left the area, upon which mobile surveillance was continued.

---

[18] Based on law enforcement databases, this car is registered to a leasing company located in Bell Canyon, California.

[19] Based on law enforcement databases, this car is registered to a company located in Chatsworth, California.

43. Approximately 30 minutes later, the gray BMW arrived in the Ross store located at 13750 Riverside Drive in Sherman Oaks, California. IRIARTE-AVILA and UM-1 exited the gray BMW and walked into the Ross store together. Shortly after, investigators saw IRIARTE-AVILA and UM-1 exit the Ross store, return to the gray BMW, and appear to wait in the car.

44. At approximately 9:04 p.m., investigators saw a white Honda HR-V bearing California License Plate 8ZOY465 (the "white Honda")[20] park next to the gray BMW. IRIARTE-AVILA exited the gray BMW carrying a brown paper bag and opened the passenger side door of the white Honda before IRIARTE-AVILA walked away and re-entered the gray BMW empty-handed.

45. Moments later, the white Honda departed the Ross store and parked near the 5200 block of Denker Avenue. Investigators saw a female, later identified F.M., exit the passenger side of the white Honda and enter a white Nissan Sentra bearing California temporary paper plate ED13H18 (the "white Nissan"), which was parked on the street in front of the white Honda.[21] Both the white Honda and white Nissan left the 5200 block of Denker Ave in tandem and arrived at the Arco gas station located at 5820 South Figueroa Street. There, a male, later identified as J.V.C., got out of the white Honda's driver-side, and F.M. left the white Nissan.

[20] Based on law enforcement databases, this car is registered to F.M. at an address in Bakersfield.

[21] Both the white Honda and white Nissan are registered to F.M.

46. Investigators coordinated a probable cause stop of both F.M. and J.V.C. for possession of suspected narcotics. Officers identified both F.M. and J.V.C. via California driver's licenses. LAPD also recovered a brown paper bag in the white Honda, which was found to contain suspected methamphetamine.

47. On April 21, 2026, LAPD laboratory testing confirmed that the drugs provided by IRIARTE-AVILA consisted of 443.80 net grams of methamphetamine

48. Based on my training, experience, and knowledge of this investigation to date, I believe that IRIARTE-AVILA uses **SUBJECT PREMISES 2** for stashing drugs, as indicated by the events detailed above.

**D. Target 5: JARAMILLO**

1. March 9, 2026: Purchase of 1.74 Grams of Methamphetamine from JARAMILLO, and Identification of MORALES-LANDEL

49. On March 9, 2026, DEA and LAPD investigators, along with DEA Air Wing,[22] established surveillance in the vicinity of the Alvarado Corridor for the purpose of conducting a buy/walk operation using DEA CS-1.[23] CS-1 utilized audio and visual

[22] DEA uses fixed-wing airplanes to surveil overhead to supplement ground units.

[23] CS-1 was convicted and sentenced to probation in 1995 and 1997 for state charges of fraud. Probation for CS-1 was completed and terminated. CS-1 was also convicted for driving under the influence in 2011. CS-1 has been working for the LAPD as an informant since 2022 and has conducted approximately 183 narcotic purchases for the LAPD. CS-1's information has led to the seizure of drugs, money, and guns in the past. CS-1's information has been corroborated throughout the investigation and deemed to be credible and reliable. CS-1 has been working for monetary compensation and has been paid a total of $42,613, since 2022.

recording equipment during the operation. Investigators dropped off CS-1 in the vicinity of MacArthur Park, and CS-1 walked into the corridor.

50. There, CS-1 approached a male, later identified as Jordan JARAMILLO ("JARAMILLO"), wearing a black sweatshirt, camouflage pants, and a mask on the street outside of a business located at 600 South Alvarado Street. CS-1 asked to purchase drugs in coded language.[24] CS-1 then handed JAMARILLO $20 and JAMARILLO handed CS-1 a white crystalline rock substance (suspected methamphetamine), which CS-1 placed into a napkin. CS-1 then met with investigators and relinquished custody of the suspected methamphetamine to investigators.

51. On March 18, 2026, DEA laboratory testing confirmed that JARAMILLO sold CS-1 approximately 1.74 grams of methamphetamine, with a 100% level of purity.

52. Investigators maintained surveillance of JAMARILLO after his sale of methamphetamine to CS-1. Another Hispanic male, who was later identified as MORALES-LANDEL, picked up JAMARILLO in his blue Chevrolet Volt. The blue Chevrolet Volt drove south on Alvarado Street and stopped at the Ross store located at 2021 West Pico Boulevard, where both individuals remained in the vehicle while parked in the parking lot.

[24] For all the controlled buys in this case, the CS or UC does not explicitly request "fentanyl" or "methamphetamine." Instead, the CS or UC uses coded language by calling fentanyl "fettie" or methamphetamine "crystal," among other terms. Sometimes, the CS or UC asks for "some stuff" and other times, nothing is said besides body language.

53. Investigators coordinated a probable cause stop of the blue Chevrolet Volt to identify the occupants of the car. During the encounter, both men identified themselves through their names and dates of birth, with the male seller identifying himself as JARAMILLO, and the driver as MORALES-LANDEL. The officers entered this information into their BlueCheck system, which is a database that searches an individual's identifying information for any prior LAPD law enforcement contacts. The officers checked the BlueCheck system and pulled up a prior Chilean passport for JARAMILLO and a prior booking photo of MORALES-LANDEL and confirmed their identities.

2. March 15, 2026: Purchase of 0.692 Grams of Fentanyl from JARAMILLO

54. On March 15, 2026, DEA investigators, along with LASD and DEA Air Wing, established surveillance in the vicinity of the Alvarado Corridor to conduct a buy/walk operation using DEA CS-2.[25] CS-2 utilized audio and video recording equipment during the conduct of the operation. Investigators dropped off CS-2 in the vicinity of MacArthur Park and walked into the corridor. CS-2 informed investigators of a possible drug dealer who was described as a Hispanic male, later identified as JARAMILLO,

[25] CS-2 has a criminal history of almost entirely theft-related crimes, with one marijuana charge. CS-2 was convicted in 1989, 1991, 1993, 1995, 1997, 1999, and 2004 for state charges of theft and burglary. CS-2 has been working for the DEA and LAPD as a confidential informant since 1991 and has conducted over 100 narcotic purchases for the DEA. CS-2's information has led to the seizure of drugs, money, and guns in the past. CS-2's information has been corroborated throughout the investigation and deemed to be credible and reliable. The CS has been working for monetary compensation and has been paid a total of $170,975 since 1991. CS-2's information has been corroborated throughout the investigation and deemed to be credible and reliable.

that appeared to be conducting hand-to-hand transactions in the vicinity of 600 South Alvarado Street, and was wearing a black sweatshirt and blue hat, and carrying a lime green bicycle.

55. Investigators maintained surveillance of JARAMILLO and saw him ride his bicycle west into MacArthur Park proper. Investigators saw JARAMILLO ride to the west end of the park, bordered by Park View Street, where he entered a black Honda Odyssey bearing California License Plate 5UNX835.[26] JARAMILLO changed his blue hat to a white hat before closing the door of the black Honda Odyssey and getting on his bicycle. He rode his bicycle east back into MacArthur Park and then returned to the Alvarado Corridor again. CS-2 saw JARAMILLO standing in the vicinity of 620 South Alvarado Steet and approached JARAMILLO. CS-2 asked to purchase drugs in coded language and gave JARMILLO $40. JARAMILLO provided CS-2 a powdery substance (suspected fentanyl) before walking away. CS-2 then met with investigators and relinquished custody of the suspected fentanyl.

56. On March 26, 2026, DEA laboratory testing confirmed that JARAMILLO sold CS-2 0.692 net grams of a mixture and substance containing a detectable amount of fentanyl.

3. <u>March 16, 2026: Purchase of 0.373 Grams of Fentanyl from JARAMILLO</u>

57. On March 16, 2026, DEA investigators and DEA Air Wing established surveillance in the vicinity of the Alvarado

---

[26] This car is registered to J.L.A. at a residence in Thousand Oaks.

Corridor to conduct a buy/walk operation using DEA CS-3.[27] CS-3 utilized audio and video recording equipment during the operation. Investigators dropped off CS-3 in the vicinity of MacArthur Park, and CS-3 walked into the corridor. There, CS-3 approached a Hispanic male wearing a blue hoodie in the vicinity of 600 South Alvarado Street. Investigators positively identified the individual as JARAMILLO based on prior controlled buys and clothing consistent with prior observations.

58. CS-3 approached JARAMILLO and asked to purchase drugs in coded language. JARAMILLO gave CS-3 a powdery substance (suspected fentanyl), and CS-3 gave JARAMILLO $20 before walking away. CS-3 met with investigators and relinquished custody of the suspected fentanyl.

59. On March 23, 2026, DEA laboratory testing confirmed that JARAMILLO sold CS-2 0.373 net grams of a mixture and substance containing a detectable amount of fentanyl.

4. March 18, 2026: Purchase of 0.278 Grams of Fentanyl Mixture from JARAMILLO

60. On March 18, 2026, DEA investigators and DEA Air Wing established surveillance in the vicinity of the Alvarado Corridor to conduct a buy/walk operation using DEA CS-1. CS-1

[27] CS-3 has a lengthy history of cooperation for the government that has resulted in seizures and arrests. CS-3 was established as a CS for DEA in 2002. CS-3 had multiple arrests in the 1980s and one in 1991. S/he was also arrested by U.S. immigration authorities in 1984 and released in 1987. CS-3 was convicted in 1983 of receiving stolen property and possession of a narcotic or controlled substance for sale. CS-3 was arrested in 2012 for acting as a dealer/manufacturer without a license and for sale of a vehicle not as the owner/dealer. CS-3 is working for monetary compensation and has been paid approximately $179,111 since 2002.

utilized audio recording equipment during the operation. Investigators dropped off CS-1 in the vicinity of MacArthur Park, and CS-1 walked into the corridor.

61. CS-1 approached a group of individuals in the vicinity of 600 South Alvarado Street. Investigators positively identified one of the individuals as JARAMILLO based on previous controlled buys, who was wearing a black jersey with the number "23" on the back. JARAMILLO appeared to be talking with an Unidentified Hispanic Male ("UHM-1") wearing a black shirt and a blue hat with the letters "LA" on the front. CS-1 approached both males and asked to buy drugs in coded language. JARAMILLO gave CS-1 a powdery substance (suspected fentanyl) in exchange for $10. CS-1 then met with investigators and relinquished custody of the suspected fentanyl.

62. On March 26, 2026, DEA laboratory testing confirmed that JARAMILLO sold to CS-1 0.278 net grams of a mixture and substance containing a detectable amount of fentanyl.

63. Also on March 18, 2026, investigators saw JARAMILLO and UHM-1 cross Alvarado Street and enter MacArthur Park, where they sat with a group of individuals in the northeast sector of the park. JARAMILLO was seen retrieving a pink cylindrical container from his backpack and appearing to pour something into the hands of UHM-1.

64. Shortly after, UHM-1 walked east out of the park, crossed Alvarado Street, and returned to the vicinity of 600 South Alvarado Street. Investigators saw UHM-1 appear to do multiple hand-to-hand transactions with unidentified individuals

consistent with drug dealing. Investigators then saw JARAMILLO walk east across Alvarado Street and return to the vicinity of 600 South Alvarado Street. There, JARAMILLO met with FLORES-CASTRO,[28] who was wearing a black hoodie with the Reebok logo on the front, and a blue hat with the letters "LA" on the front. During this time, investigators saw JARAMILLO do multiple hand-to-hand transactions with unidentified individuals in the vicinity of 600 South Alvarado Street.

65. Shortly after, investigators saw JARAMILLO walk to the front of the El Paraiso business located at 600 South Alvarado Street. Investigators observed JARAMILLO appear to converse with an Unidentified Hispanic Female ("UHF-2") wearing a black t-shirt working at El Paraiso. JARAMILLO appeared to hand money to UHF-2, and UHF-2 handed JARAMILLO something in return. JARAMILLO turned around and placed something in the hands of an Unidentified White Male ("UWM"), consistent with the many other hand-to-hand suspected drug transactions investigators have observed JARAMILLO conduct during this investigation to-date.

[28] On March 18, 2026, officers identified FLORES-CASTRO via BlueCheck. FLORES-CASTRO provided the LAPD with identifying information, and the officers pulled up a prior booking photo of FLORES-CASTRO, thereby confirming his identity.


UHF-2
JARAMILLO
Suspected drug customer



**E. Target 6: FLORES-CASTRO**

1. March 17, 2026: Purchase of 0.235 Grams of Fentanyl Mixture from FLORES-CASTRO

66. On March 17, 2026, DEA and LAPD investigators and DEA Air Wing established surveillance in the vicinity of the Alvarado Corridor to conduct a buy/walk operation using CS-1. CS-1 utilized audio and video recording equipment during the conduct of the operation. Investigators dropped off CS-1 in the vicinity of MacArthur Park, and CS-1 walked into the corridor.

67. CS-1 observed a Hispanic male, later identified as FLORES-CASTRO, wearing a blue hoodie with the logo "Champion" on the front, standing in front of a business located at 626 South Alvarado Street. CS-1 approached and asked to buy drugs in coded language from FLORES-CASTRO. FLORES-CASTRO provided CS-1 with a powdery substance (suspected fentanyl) in exchange for $10. CS-1 then met with investigators and relinquished custody of the suspected fentanyl.

68. On March 26, 2026, DEA laboratory testing confirmed that FLORES-CASTRO sold CS-1 0.235 net grams of a mixture and substance containing a detectable amount of fentanyl.

69. After the sale, investigators maintained surveillance of FLORES-CASTRO and coordinated the approach of multiple LAPD officers on foot to attempt to identify him. LAPD officers conducted a probable cause stop of FLORES-CASTRO based on the observed drug sale and used BlueCheck to confirm his identity based on a prior booking photo. FLORES-CASTRO was also found in possession of approximately 10.9 grams of suspected fentanyl and

35.67 grams of suspected methamphetamine[29] inside his sweatshirt pocket.

2. March 20, 2026: Purchase of 0.695 Grams of Fentanyl Mixture from FLORES-CASTRO

70. On March 20, 2026, DEA, LAPD investigators, and DEA Air Wing established surveillance in the vicinity of the Alvarado Corridor to conduct a buy/walk operation utilizing DEA CS-2. CS-2 utilized audio recording equipment during the operation. Investigators dropped off CS-2 in the vicinity of MacArthur Park, and CS-2 walked into the corridor.

71. CS-2 observed a Hispanic male, later identified as FLORES-CASTRO, standing in the Alvarado Corridor. CS-2 approached and asked to buy drugs, in coded language, from FLORES-CASTRO. FLORES-CASTRO provided CS-2 with a powdery substance (suspected fentanyl) in exchange for $40.

72. On April 9, 2026, DEA laboratory testing confirmed that FLORES-CASTRO sold CS-2 0.695 net grams of a mixture and substance containing a detectable amount of fentanyl.

73. After the sale, investigators maintained surveillance of FLORES-CASTRO and coordinated the approach of multiple LAPD officers on foot to attempt to re-confirm his identity. LAPD officers conducted a probable cause stop of FLORES-CASTRO based on the drug sale and used BlueCheck to confirm his identity, which was subsequently confirmed via a prior booking photo.

[29] These drugs were never tested and are in the custody of the LAPD and not the DEA. The DEA has put in a request for these drugs to be tested at the DEA laboratory.

**F. Targets 7-8: GONZALEZ-GONZALEZ / BARRETO-RIOS**

1. March 29, 2026: Purchase of 0.33 Net Grams of Fentanyl Mixture from GONZALEZ-GONZALEZ and 1.687 Grams of Pure Methamphetamine from BARRETO-RIOS

74. On March 29, 2026, DEA investigators established surveillance in the vicinity of the Alvarado Corridor to conduct a buy/walk operation using CS-3. CS-3 utilized audio and video recording equipment during the operation. Investigators dropped off CS-3 in the vicinity of MacArthur Park, and CS-3 walked into the corridor.

75. Investigators saw a man, later identified as Jhonathan GONZALEZ-GONZALEZ ("GONZALEZ-GONZALEZ"), wearing a black hat and a facemask in the vicinity of 600 South Alvarado Street, standing next to a man later identified as Alex Enrique MORONES ("MORONES").[30] CS-3 approached GONZALEZ-GONZALEZ and asked to purchase drugs in coded language. GONZALEZ-GONZALEZ gave CS-3 a powdery substance (suspected fentanyl) in exchange for $20. CS-3 met with investigators and relinquished custody of the suspected fentanyl.

76. On April 13, 2026, DEA laboratory testing confirmed that GONZALEZ-GONZALEZ sold CS-3 0.33 net grams of a mixture and substance containing a detectable amount of fentanyl.

77. After the sale, investigators maintained surveillance on GONZALEZ-GONZALEZ and coordinated the approach of multiple LAPD officers on foot to attempt to identify him. GONZALEZ-GONZALEZ and MORONES quickly began walking northbound on

---

[30] Investigators previously identified MORONES on March 23, 2026 after a sale of fentanyl via BlueCheck.

Alvarado Street before turning eastbound on 6th Street, which was opposite from LAPD uniformed officers walking north on Alvarado Street. Law enforcement lost sight of GONZALEZ-GONZALEZ near 6th Street and Westlake Avenue. Investigators, as well as LAPD uniformed officers, began searching for GONZALEZ-GONZALEZ. During the search, LAPD officers saw GONZALEZ-GONZALEZ appearing to hide near cars parked in a lot located on the southwest corner of the intersection of 6th Street and Westlake Avenue. LAPD officers approached and detained GONZALEZ-GONZALEZ and identified him.[31]

78. Following the stop, law enforcement maintained surveillance of the Alvardo Corridor. Investigators observed a male, later identified as BARRETO-RIOS,[32] who was wearing a black hat and black facemask standing in the Bonita Mall. CS-3 approached BARRETO-RIOS and asked to purchase drugs in coded language. BARRETO-RIOS gave CS-3 a crystalline substance (suspected methamphetamine) in exchange for $20.

79. On April 30, 2026, DEA laboratory testing confirmed that BARRETO-RIOS sold CS-3 1.687 net grams of pure methamphetamine.

80. Investigators then saw BARRETO-RIOS walk north through the Alvarado Corridor and approach a Hispanic male, who

[31] During this stop, GONZALEZ-GONZALEZ was not in possession of any identifying documentation and was not in the BlueCheck database. As a result, he was arrested, booked, fingerprinted, and released.

[32] On April 21, 2026, during a surveillance operation, officers stopped BARRETO-RIOS and confirmed his identity based on a prior booking photograph LAPD had of him.

I know to be L.S.M.,[33] in the shop "Alvarado Electronic's" [sic] located directly south of El Paraiso. BARRETO-RIOS was seen handing what appeared to be cash to L.S.M. before walking south again on the Alvardo Corridor and appearing to conduct multiple hand-to-hand transactions with narcotics users. Over the course of the next hour or so, BARRETO-RIOS conducted other hand-to-hand transactions, returned to L.S.M. located in Alvarado Electronic's multiple times, and appeared to hand L.S.M. cash.

**G. Target 9: HERRERA**

1. March 10, 2026: Purchase of 0.382 Grams of Fentanyl Mixture and 0.98 Grams of Methamphetamine from HERRERA

81. On March 10, 2026, DEA and LAPD investigators, along with DEA Air Wing, established surveillance in the vicinity of the Alvarado Corridor to conduct a buy/walk operation using CS-1. CS-1 utilized audio and visual recording equipment during the operation. Investigators dropped off CS-1 in the vicinity of MacArthur Park, and CS-1 walked into the corridor.

82. CS-1 approached a Hispanic male, later identified as HERRERA, standing in the pedestrian walkway underneath the address marker for 630 South Alvarado Street. CS-1 approached and asked HERRERA for drugs in coded language. HERRERA told CS-1 he could get CS-1 some. While waiting, CS-1 saw multiple plastic baggies containing a white substance, as well as firearms, on

[33] On March 4, 2026, I assisted with an FBI takedown that occurred on the Alvarado Corridor. SA Ramos assisted with the detention of L.S.M. and his subsequent identification by LAPD officers.

the steps behind HERRERA. CS-1 then paid HERRERA $30 for a powdery substance (suspected fentanyl) and a crystalline substance (suspected methamphetamine) and walked away. CS-1 met with investigators and relinquished custody of the suspected methamphetamine and fentanyl.

83. On March 19 and 20, 2026, DEA laboratory testing confirmed, respectively, that HERRERA sold CS-1 0.98 grams of methamphetamine at 100% purity and 0.382 net grams of a mixture and substance containing a detectable amount of fentanyl.

84. After the sale, investigators maintained surveillance of HERRERA in the vicinity of 630 South Alvarado Street and coordinated the approach of multiple LAPD officers on foot to attempt to identify him. During the stop, he identified himself as HERRERA and provided the officers with a California driver's license. Subsequent queries based on information from the California driver's license confirmed that the person was indeed HERRERA.

**H. Target 10: GARCIA-GOMEZ**

1. March 12, 2026: Purchase of 0.752 Grams of Fentanyl Mixture from GARCIA-GOMEZ.

85. On March 12, 2026, DEA investigators, along with LASD detectives and DEA Air Wing, established surveillance in the vicinity of the Alvarado Corridor to conduct a buy/walk operation using CS-2. CS-2 utilized audio and video recording equipment during the operation. Investigators dropped off CS-2 in the vicinity of MacArthur Park, and CS-2 walked into the corridor.

86. CS-2 informed investigators that a Hispanic male, later identified as Fredi David GARCIA-GOMEZ ("GARCIA-GOMEZ"), wearing a white t-shirt with an Adidas logo with short hair, was standing in front of a business located at 636 South Alvarado Street and offered to sell drugs to CS-2 in coded language. Specifically, CS-2 saw GARCIA-GOMEZ appearing to sell drugs. GARCIA-GOMEZ approached CS-2 and asked CS-2 if CS-2 wanted anything. CS-2 left briefly to speak with investigators to see if he was allowed to buy from GARCIA-GOMEZ.

87. After getting confirmation from investigators, CS-2 approached GARCIA-GOMEZ to buy drugs. GARCIA-GOMEZ handed CS-2 a powdery substance (suspected fentanyl) in exchange for $40. CS-2 then met with investigators and relinquished custody of the suspected fentanyl.

88. On March 20, 2026, DEA laboratory testing confirmed that GARCIA-GOMEZ sold CS-2 0.752 net grams of a mixture and substance containing a detectable amount of fentanyl.

89. After the sale, investigators maintained surveillance of GARCIA-GOMEZ and coordinated the approach of multiple LAPD officers on foot to attempt to identify him. LAPD officers conducted a probable cause stop of GARCIA-GOMEZ based on the drug sale and used BlueCheck to confirm his identity.

2. <u>March 13, 2026: Purchase of 0.728 Grams of Fentanyl Mixture from GARCIA-GOMEZ.</u>

90. On March 13, 2026, DEA investigators along with DEA Air Wing established surveillance in the vicinity of the Alvarado Corridor to conduct a buy/walk operation using CS-2.

CS-2 utilized audio and video recording equipment during the operation. Investigators dropped off CS-2 in the vicinity of MacArthur Park, and CS-2 walked into the corridor.

91. Per CS-2, s/he identified a possible drug dealer previously identified as GARCIA-GOMEZ in the vicinity of 600 South Alvarado Street. CS-2 provided GARCIA-GOMEZ with $40. In exchange, and without needing to converse, GARCIA-GOMEZ provided CS-2 with a white powdery substance (suspected fentanyl). CS-2 then met with investigators and relinquished custody of the suspected fentanyl.

92. On March 23, 2026, DEA laboratory testing confirmed that GARCIA-GOMEZ sold CS-2 0.728 net grams of a mixture and substance containing a detectable amount of fentanyl.

**I. Target 11: PALUCHA**

1. March 14, 2026: Purchase of 0.709 Net Grams of Fentanyl Mixture from PALUCHA.

93. On March 14, 2026, DEA and LAPD investigators, along with DEA Air Wing, established surveillance in the vicinity of the Alvarado Corridor to conduct a buy/walk operation using DEA CS-2. CS-2 utilized audio and video recording equipment during the operation. Investigators dropped off CS-2 in the vicinity of MacArthur Park, and CS-2 walked into the corridor.

94. Per CS-2, s/he identified a possible drug dealer standing in the vicinity of 608 South Alvarado Street wearing a gray shirt, khaki cargo shorts, and a gray hat, who was later identified as Jonathan Enrique PALUCHA ("PALUCHA"). CS-2 approached and asked PALUCHA for drugs in coded language.

PALUCHA handed CS-2 a powdery substance (suspected fentanyl) in exchange for $40. CS-2 then met with investigators and relinquished custody of the suspected fentanyl.

95. On March 20, 2026, DEA laboratory testing confirmed that PALUCHA sold CS-2 approximately 0.709 net grams of a mixture and substance containing a detectable amount of fentanyl.

96. After the sale, investigators maintained surveillance of PALUCHA and coordinated the approach of multiple LAPD officers on foot to attempt to identify him. LAPD officers conducted a probable cause stop of PALUCHA based on the drug sale and used BlueCheck to confirm his identity.

**J. Target 12: FINDEIS**

1. March 14, 2026: Purchase of 0.426 Grams of Fentanyl Mixture from FINDEIS.

97. On March 14, 2026, investigators dropped off CS-2 again in the vicinity of MacArthur Park, and CS-2 walked into the corridor. Per CS-2, s/he identified a possible drug dealer standing on the southwest corner of Wilshire Boulevard and Alvarado Street wearing a white shirt, brown pants, and a black hat with an "NY" logo on it, who was later identified as Elijah Zioni FINDEIS ("FINDEIS").

98. CS-2 approached and asked for "fettie." CS-2 gave FINDEIS $40 and FINDEIS provided CS-2 with a powdery substance (suspected fentanyl). CS-2 then met with investigators and relinquished custody of the suspected fentanyl.

99. On March 20, 2026, DEA laboratory testing confirmed that FINDEIS sold CS-2 0.426 net grams of a mixture and substance containing a detectable amount of fentanyl.

100. After the sale, investigators maintained surveillance of FINDEIS and coordinated the approach of multiple LAPD officers on foot to attempt to identify him. LAPD officers conducted a probable cause stop of FINDEIS based on the drug sale and used BlueCheck to confirm his identity.

**K. Target 13: THIGPEN**

1. March 19, 2026: Purchase of 4.16 Grams of Methamphetamine from THIGPEN.

101. On March 19, 2026, DEA investigators established surveillance in the vicinity of the Alvarado Corridor to conduct a buy/walk operation utilizing CS-4.[34] CS-4 utilized audio and video recording equipment during the conduct of the operation. Investigators dropped off CS-4 in the vicinity of MacArthur Park, and CS-4 walked into the corridor.

102. CS-4 approached a Black male in the vicinity of 600 South Alvarado Street, later identified as Kevin Anthony THIGPEN ("THIGPEN"). CS-4 approached THIGPEN and asked to buy drugs in coded language. THIGPEN gave CS-4 a crystalline substance

---

[34] CS-4 is currently in good standing with the DEA and has proven to be reliable and has been corroborated to the extent possible, including as discussed in this affidavit. CS-4 is a paid confidential source and is not facing any criminal charges. CS-4 was established as a DEA confidential source since 2019. CS-4 is not being paid and is working with DEA for judicial leniency and sentence reduction. CS-4's criminal history includes prior convictions for felony armed robbery in 1990, conspiracy to sell cocaine in 1992, and felony robbery in 1996.

(suspected methamphetamine) in exchange for $40. CS-4 met with investigators and relinquished custody of the suspected methamphetamine.

103. On April 6, 2026, DEA laboratory testing confirmed that THIGPEN sold CS-4 4.16 grams of pure methamphetamine.

104. After the sale, investigators maintained surveillance of THIGPEN and coordinated the approach of multiple LAPD officers on foot to attempt to identify him. LAPD officers conducted a probable cause stop of THIGPEN based on the drug sale and used BlueCheck to confirm his identity.

**L. Target 14: MORONES**

1. March 23, 2026: Purchase of 0.25 Grams of Fentanyl Mixture from MORONES.

105. On March 23, 2026, DEA investigators established surveillance in the vicinity of the Alvarado Corridor to conduct a buy/walk operation using CS-3. CS-3 utilized audio and video recording equipment during the conduct of the operation. Investigators dropped off CS-3 in the vicinity of MacArthur Park, and CS-3 walked into the corridor.

106. CS-3 approached a group of individuals in the vicinity of 600 South Alvarado Street. Investigators observing the scene identified one of the individuals that was wearing a black mask, baseball hat, and t-shirt as GONZALEZ-GONZALEZ. Investigators also later identified another individual wearing a blue sweatshirt as MORONES. Per CS-3 and as seen by investigators, both GONZALEZ-GONZALEZ and MORONES appeared to be conducting hand-to-hand transactions. CS-3 approached both men and asked to

buy drugs in coded language. MORONES gave CS-3 a powdery substance (suspected fentanyl) in exchange for $10. CS-3 met with investigators and relinquished custody of the suspected fentanyl.

107. On April 9, 2026, DEA laboratory testing confirmed that MORONES sold CS-3 0.25 net grams of a mixture and substance containing a detectable amount of fentanyl.

108. After the sale, investigators maintained surveillance of MORONES and coordinated the approach of multiple LAPD officers on foot to attempt to identify him. LAPD officers conducted a probable cause stop of MORONES based on the drug sale and was identified via BlueCheck.[35]

**M. Target 15: CANELO**

1. March 27, 2026: Purchase of 0.15 Grams of Fentanyl Mixture from CANELO.

109. On March 27, 2026, DEA investigators established surveillance in the vicinity of the Alvarado Corridor to conduct a buy/walk operation using CS-3. CS-3 utilized audio and video recording equipment during the operation. Investigators dropped off CS-3 in the vicinity of MacArthur Park, and CS-3 walked into the corridor.

110. CS-3 approached a group of individuals in the vicinity of 600 South Alvarado Street. Investigators later identified one of the individuals, who was wearing a blue hat, black jersey with white lettering, as Jorge Luis CANELO ("CANELO"). CS-3

[35] Following BlueCheck, law enforcement also used MORONES's identifying information to query CalDMV, which found his driver's license photo, thereby confirming his identity.

approached CANELO and asked to buy drugs in coded language. CAENLO gave CS-3 a powdery substance (suspected fentanyl) in exchange for $20. CS-3 then met with investigators and relinquished custody of the suspected fentanyl.

111. On April 14, 2026, DEA laboratory testing confirmed that CANELO sold CS-3 0.15 net grams of a mixture and substance containing a detectable amount of fentanyl.

112. After the sale, investigators maintained surveillance of CANELO and coordinated the approach of multiple LAPD officers on foot to attempt to identify him. LAPD officers conducted a probable cause stop of CANELO based on the drug sale and used BlueCheck to confirm his identity.

**N. Targets 16-17: ORELLANA-GARCIA / SOLANO**

1. <u>April 1, 2026: Purchase of 0.72 Grams of Fentanyl Mixture from ORELLANA-GARCIA.</u>

113. On March 31, 2026, DEA investigators established surveillance in the vicinity of the Alvarado Corridor to conduct a buy/walk operation using CS-1. CS-1 utilized audio recording equipment during the operation. Investigators dropped off CS-1 in the vicinity of MacArthur Park, and CS-1 walked into the corridor.

114. CS-1 approached a smoke shop located in the southern end of the Bonita Mall. Near the smoke shop was a Hispanic male, identified as J.C.[36] CS-1 informed J.C. that CS-1 was looking to buy drugs in coded language. J.C. handed CS-1 two scraps of

[36] Investigators, including myself, were aware of J.C. as an associate of the smoke shop prior to this investigation. His previous booking photo was used to identify him on this date.

paper, one that said "Alvarado Smoke Shop (323)-571-9821 (323)-947-9877," and another that said "Alvarado Smoke Shop (323)-571-9821." I am aware from reviewing a police report that the number ending in -9877 was the same number Keren ORELLANA-GARCIA ("ORELLANA-GARCIA") told LAPD officers was hers on November 29, 2025, when police were called for a domestic violence incident involving ORELLANA-GARCIA and Cesar David SOLANO ("SOLANO"). After receiving the scraps of paper, CS-1 purchased drugs from a separate individual.

115. On April 1, 2026, CS-1 called one of the phone numbers provided by ORELLANA-GARCIA the previous day, (323) 571-9821 ("SMOKE SHOP 1 NUMBER"). An Unidentified Hispanic Male ("UHM-2") answered in English and CS-1 asked to purchase drugs in coded language. UHM-2 directed CS-1 to walk in the vicinity of 6th Street and Alvarado Street before hanging up. CS-1 complied and called SMOKE SHOP 1 NUMBER again. A female answered the call, later identified as ORELLANA-GARCIA,[37] who directed CS-1 to walk to the corner of Wilshire Boulevard and Alvarado Street.[38] CS-1 complied and shortly after arriving, a silver Ford Escape bearing California License Plate 9VOT615[39] pulled curbside where CS-1 was located. CS-1 approached the front passenger side of the silver Ford Escape and gave $40 to ORELLANA-GARCIA in

---

[37] Prior to surveillance, investigators were aware of ORELLANA-GARCIA and had a prior booking photograph of her. Investigators confirmed her identity using the booking photograph when she met with CS-1 after the phone call.

[38] CS-1 stated that the voice from the phone call was the same voice as ORELLANA-GARCIA, who sold CS-1 the drugs that day.

[39] This car is registered to H.O at a residence in Los Angeles.

exchange for a small baggie containing a powdery substance (suspected fentanyl).

116. On April 13, 2026, DEA laboratory testing confirmed that ORELLANA-GARCIA sold CS-1 0.72 net grams of a mixture and substance containing a detectable amount of fentanyl.

2. April 2, 2026: Purchase of 1.33 Grams of Fentanyl Mixture from SOLANO.

117. On April 2, 2026, DEA investigators established surveillance in the vicinity of the Alvarado Corridor to conduct a buy/walk operation using CS-1. CS-1 utilized audio and video recording equipment during the operation. Investigators dropped off CS-1 in the vicinity of MacArthur Park, and CS-1 walked into the corridor.

118. CS-1 approached the smoke shop located in the southern end of the Bonita Mall. At the smoke shop, CS-1 encountered J.C. again, who directed CS-1 to the rear of the smoke shop where CS-1 saw ORELLANA-GARCIA and a Hispanic male later identified as SOLANO.[40] CS-1 asked for $60 of drugs, in coded language, and SOLANO retrieved a small baggie containing a powdery substance (suspected fentanyl) from his pocket, placed it in a plastic bag, and gave it to CS-1 in exchange for $60. CS-1 then met with DEA investigators and relinquished the suspected fentanyl.

119. On April 13, 2026, DEA laboratory testing confirmed that SOLANO sold CS-1 1.33 net grams of a mixture and substance containing a detectable amount of fentanyl.

---

[40] Investigators believe SOLANO is ORELLANA-GARCIA’s boyfriend. Investigators were aware of SOLANO and had a prior booking photograph of SOLANO to identify him during this surveillance.

### O. Target 18: MCDANIEL

#### 1. April 3, 2026: Purchase of 0.322 Grams of Pure Methamphetamine from MCDANIEL.

120. On April 3, 2026, DEA and LAPD investigators, along with DEA Air Wing, established surveillance in the vicinity of the Alvarado Corridor to conduct a buy/walk operation utilizing CS-2. CS-2 utilized audio recording equipment during the operation. Investigators dropped off CS-2 in the vicinity of MacArthur Park, and CS-2 walked into the corridor.

121. Per CS-2, s/he identified a possible drug dealer standing in the vicinity of 620 South Alvarado Street, who was later identified as Cody MCDANIEL ("MCDANIEL"). CS-2 approached and asked MCDANIEL for drugs in coded language. MCDANIEL handed CS-2 a crystalline substance (suspected methamphetamine) in exchange for $40. CS-2 then met with investigators and relinquished custody of the suspected methamphetamine.

122. On April 30, 2026, DEA laboratory testing confirmed that MCDANIEL sold CS-2 0.322 grams of pure methamphetamine.

123. After the sale, investigators maintained surveillance of MCDANIEL and coordinated the approach of multiple LAPD officers on foot to attempt to identify him. LAPD officers conducted a probable cause stop of MCDANIEL based on the drug sale and used BlueCheck to confirm his identity.

### P. Target 19: JIMENEZ-CABARICO

#### 1. April 3, 2026: Purchase of 0.675 Grams of Fentanyl Mixture from JIMENEZ-CABARICO.

124. On April 3, 2026, investigators dropped off CS-2 in the vicinity of MacArthur Park, and CS-2 walked into the

corridor. Per CS-2, s/he identified a possible drug dealer standing in the vicinity of 630 South Alvarado Street, who was later identified as Yohan JIMENEZ-CABARICO ("JIMENEZ-CABARICO"). CS-2 approached and gave JIMENEZ-CABARICO $40. Without needing to converse, JIMENEZ-CABARICO provided CS-2 with a powdery substance (suspected fentanyl). CS-2 then met with investigators and relinquished custody of the suspected fentanyl.

125. On April 16, 2026, DEA laboratory testing confirmed that JIMENEZ-CABARICO sold CS-2 0.675 net grams of a mixture and substance containing a detectable amount of fentanyl.

126. After the sale, investigators maintained surveillance of JIMENEZ-CABARICO and coordinated the approach of multiple LAPD officers on foot to attempt to identify him. LAPD officers conducted a probable cause stop of JIMENEZ-CABARICO based on the drug sale and used BlueCheck to confirm his identity.

**Q. Target 20: ZAVALA**

1. April 6, 2026: Purchase of 0.96 Grams of Fentanyl Mixture from ZAVALA.

127. On April 6, 2026, DEA investigators established surveillance in the vicinity of the Alvarado Corridor to conduct a buy/walk operation using CS-3. CS-3 utilized audio recording equipment during the operation. Investigators dropped off CS-3 in the vicinity of MacArthur Park, and CS-3 walked into the corridor.

128. Per CS-3, s/he observed a Hispanic male standing in MacArthur Park proper just west of Alvarado Street, later identified as Michael ZAVALA ("ZAVALA"). CS-3 approached and

asked to buy drugs in coded language from ZAVALA. ZAVALA provided CS-3 with a powdery substance (suspected fentanyl) in exchange for $70. CS-3 then met with investigators and relinquished custody of the suspected fentanyl.

129. On April 28, 2026, DEA laboratory testing confirmed that ZAVALA sold CS-3 0.96 net grams of a mixture and substance containing a detectable amount of fentanyl.

130. After the sale, investigators maintained surveillance of ZAVALA and coordinated the approach of multiple LAPD officers on foot to attempt to identify him. LAPD officers conducted a probable cause stop of ZAVALA based on the drug sale and used BlueCheck to confirm his identity.

**R. Target 21: TAPIA**

1. April 9, 2026: Purchase of 0.246 Grams of Fentanyl from TAPIA and JARAMILLO.

131. On April 9, 2026, DEA investigators established surveillance in the vicinity of the Alvarado Corridor to conduct a buy/walk operation using CS-2. CS-2 utilized audio recording equipment during the operation. Investigators dropped off CS-2 in the vicinity of MacArthur Park, and CS-2 walked into the corridor.

132. CS-2 saw JARAMILLO standing in MacArthur Park just west of Alvarado Street. CS-2 approached JAMARILLO, asked for drugs in coded language, and handed JARAMILLO $40. JARAMILLO then walked south and met with a Hispanic female later identified as Star Angel TAPIA ("TAPIA"). Investigators saw JARAMILLO hand TAPIA cash, after which TAPIA reached into a

black backpack and retrieved a plastic bag that TAPIA used to pour a substance into JARAMILLO's hand. Investigators kept TAPIA and JARAMILLO under surveillance, and JARAMILLO walked to CS-2 and gave CS-2 what was in his hand, which was a powdery substance (suspected fentanyl). Investigators did not see JARAMILLO do anything else with his hand between the time that TAPIA poured the substance into JARAMILLO's hand, and JARAMILLO giving CS-2 what was in that same hand. CS-2 then met with investigators and relinquished custody of the suspected fentanyl.

133. On April 29, 2026, DEA laboratory testing confirmed that TAPIA and JARAMILLO sold CS-2 0.246 net grams of a mixture and substance containing a detectable amount of fentanyl.

134. After the sale, investigators maintained surveillance of TAPIA and coordinated the approach of multiple LAPD officers on foot to attempt to identify her. LAPD officers conducted a probable cause stop of TAPIA based on the drug sale and used BlueCheck to confirm her identity.

**S. Targets 22-25: HARRIS / JACKSON / MEDINA / ZUNIGA**

135. On April 15, 2026, DEA and LASD investigators established surveillance on the Alvarado Corridor to conduct multiple buy/walk operations using LASD UCs. UCs utilized audio and video recording equipment during the operation.

1. <u>April 15, 2026: Purchase of 0.087 Net Grams of Methamphetamine from HARRIS.</u>

136. Investigators dropped off UC-1 in the vicinity of MacArthur Park, and UC-1 walked into the corridor. There, UC-1

observed a group of individuals standing in the vicinity of the Alvarado Corridor. UC-1 approached them and asked to buy methamphetamine in coded language. A Black male, later identified as Michael Tyrone HARRIS ("HARRIS"), provided UC-1 with a crystalline substance (suspected methamphetamine) in exchange for $30. UC-1 then met with investigators and relinquished custody of the suspected methamphetamine to investigators.

137. On April 28, 2026, DEA laboratory testing confirmed that HARRIS sold UC-1 0.087 net grams of methamphetamine.

138. After the sale, investigators maintained surveillance of HARRIS and coordinated the approach of multiple LASD deputies on foot to attempt to identify him. LASD deputies conducted a probable cause stop of HARRIS based on the drug sale, and the officers identified HARRIS by his driver's license.

2. April 15, 2026: Purchase of 0.403 Grams of Pure Methamphetamine from JACKSON and MEDINA.

139. Investigators dropped off UC-2 in the vicinity of MacArthur Park, and UC-2 walked into the corridor. UC-2 walked south to the southwest corner of Alvarado Street and 7th Street, where UC-2 saw a Hispanic male wearing a black and white shirt and black and white pants, later identified as Eliezer Navarro MEDINA ("MEDINA"). UC-2 approached MEDINA and told MEDINA that s/he had $20.

140. MEDINA asked UC-2 what s/he wanted, and UC-2 said s/he wanted crystal. MEDINA then spoke with several Hispanic males, including a Hispanic male later identified as Jamere JACKSON

("JACKSON"), and MEDINA called JACKSON over. JACKSON then rode away. A few moments later, JACKSON returned while riding his bicycle. MEDINA escorted UC-2 to JACKSON. JACKSON then displayed a baggie containing a crystalline substance (suspected methamphetamine). JACKSON gave UC-2 the baggie in exchange for $20. UC-2 then met with investigators and relinquished custody of the suspected methamphetamine.

141. On April 29, 2026, DEA laboratory testing confirmed that JACKSON and MEDINA sold UC-2 0.403 grams of pure methamphetamine.

142. After the sale, investigators maintained surveillance of JACKSON and MEDINA and coordinated the approach of multiple LASD deputies on foot to attempt to identify them. LASD deputies conducted probable cause stops of JACKSON and MEDINA based on the drug sales, and the officers identified  were identified by their driver's licenses.

3. <u>April 15, 2026: Purchase of 0.215 Grams of Pure Methamphetamine from ZUNIGA.</u>

143. Investigators dropped off UC-3 in the vicinity of MacArthur Park, and UC-3 walked into the corridor. UC-3 saw a White male, later identified as Joseph ZUNIGA ("ZUNIGA"), approached him, and asked to buy methamphetamine in coded language. ZUNIGA provided UC-3 with a crystalline substance (suspected methamphetamine) in exchange for $20. UC-3 then met with investigators and relinquished custody of the suspected methamphetamine to investigators.

144. On April 29, 2026, DEA laboratory testing confirmed that JACKSON and MEDINA sold UC-3 0.215 grams of pure methamphetamine.

145. After the sale, investigators maintained surveillance of ZUNIGA and coordinated the approach of multiple LASD deputies on foot to attempt to identify him. LASD deputies conducted a stop of ZUNIGA where he was subsequently identified by his driver's license.

## V. TRAINING AND EXPERIENCE ON DRUG OFFENSES

146. Based on my training and experience investigating drug-trafficking offenses and my familiarity with similar investigations conducted by other law enforcement agents, I know the following, which pertain, in part, to the items to be seized in Attachment B:

a. Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.

b. Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

c. Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs. These records are often maintained where drug

traffickers have ready access to them, such as on their cell phones and other digital devices, and in their residences or stash houses. They often maintain these records in their residences or stash houses for months or years at a time. It is common, for example, for narcotics traffickers to keep pay/owe sheets or other papers of narcotics sold and monies owed. Such pay/owe sheets or papers are used as a basis for accounting and for settling existing debts. Such records are often maintained for a substantial period of time even after the debts are collected. Such records are invaluable to narcotics traffickers and such records are rarely discarded. Such records and pay/owe sheets also frequently include the names, identities and telephone numbers of suppliers, customers and co-conspirators. Based on my knowledge of this investigation and given that **SUBJECT PREMISES 1** and **SUBJECT PREMISES 2** have been identified as locations that store illegal drugs, I would expect to find such records described above at these locations, including in digital devices located at **SUBJECT PREMISES 1** and **SUBJECT PREMISES 2.**

d. Individuals involved in narcotics trafficking must often rely on others to obtain their drugs and to help them market the narcotics. Frequently, traffickers maintain evidence of the identities of these co-conspirators at their residences and stash houses. Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices and in their residences or stash houses. Drug traffickers often keep records of meetings

with associates, customers, and suppliers on their digital devices and in their residences and stash houses, including in the form of calendar entries and location data. Based on my knowledge of this investigation and given that **SUBJECT PREMISES 1** and **SUBJECT PREMISES 2** have been identified as locations that store illegal drugs, I would expect to find such records described above at these locations, including in digital devices located at **SUBJECT PREMISES 1** and **SUBJECT PREMISES 2**.

e. Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices. This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal. In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

f. Individuals involved in narcotics trafficking commonly earn income in the form of cash and try to legitimize these profits. To do this, traffickers frequently attempt to secrete, transfer and conceal the money by means, including, but not limited to: placing assets in names other than their own to avoid detection while maintaining control; laundering the money through what appears to be a legitimate business or businesses;

hiding money in their homes, safes and safety deposit boxes; or using the money to buy assets which are difficult to trace. Records of these and other types of transactions are often found at the residences, stash houses, and/or digital devices of individuals involved in narcotics trafficking.

g. Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis. Such currency is often stored in their residences, vehicles, or stash houses. Additionally, individuals involved in narcotics trafficking often amass and maintain assets at their residences or stash houses, which were generated by their trafficking activities, or purchased with the cash earned from such trafficking.

h. Residences and stash houses used by individuals involved in narcotics trafficking usually contain articles of personal property evidencing the identity of person(s) occupying, possessing, residing in, owning, frequenting or controlling the residence and premises.

i. Drug traffickers also regularly carry firearms (loaded with ammunition) during and in connection with their drug trafficking activities. For example, drug traffickers may possess a firearm to protect their stash of drugs or fend off robbery attempts. In my career, I have regularly encountered drug traffickers possessing firearms (including loaded with ammunition) for a similar purpose.

j. Drug traffickers often keep drugs in places where they have ready access and control, such as at their residences, at their stash houses, or in safes. They also often keep other items related to their drug trafficking activities at their residence, such as digital scales, packaging materials, and proceeds of drug trafficking, including the items listed in Attachment B, paragraphs 1(b) and 1(d). These items are often small enough to be easily hidden and thus may be kept at a drug trafficker's residence even if the drug trafficker lives with others who may be unaware of his criminal activity.

k. Individuals involved in drug trafficking often maintain several digital devices, including cellular telephones, computers, tablets, and other communication devices, at their residences, residences of associates, stash houses, places of business, in their vehicles, and/or on their person for the purpose of arranging transactions. These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones" or "burner phones," for actual voice communications. Persons attempting to arrange for the sale, purchase, transportation and manufacture of controlled substances frequently will contact their illegal business customers, purveyors, and associates to negotiate business deals. Further, it has been my experience that those involved in drug trafficking maintain contact information for other coconspirators in their cellular telephones.

l. The above-described documents are often possessed by narcotics dealers and manufacturers much the same way a legitimate business will maintain records and tools of its trade whether or not the business has a particular item in inventory on a given date. These documents are kept by narcotics dealers whether or not the dealer is in possession of any drugs or chemicals at any given moment.

147. Based on my knowledge of this investigation, I believe there is probable cause to believe that evidence of the **Subject Offenses** will be found at the **SUBJECT PREMISES**, which have been accessed by TARGETS, and of which I believe are used for storing and trafficking drugs. I further submit that there is probable cause to believe that evidence of the **Subject Offenses** will be found on persons found within the **SUBJECT PREMISES** as well as any digital devices found therein. Such evidence is likely to include evidence of a TARGET's participation in drug trafficking, as well as participating in drug trafficking at the **SUBJECT PREMISES**, and elsewhere; the identities and involvement of drug customers and any other co-conspirators; the identities of sources of supply; the manner and means by which the TARGETS may launder or conceal the proceeds of their drugs and traffic drugs; and the locations of other places where they may keep, conceal, or distribute drugs.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[41]

148. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents,

[41] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

149. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above. Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

150. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a

device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

c. In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, if while executing the warrant, law enforcement personnel encounter a digital device within the scope of the warrant that may be unlocked using one of the aforementioned biometric features, the

warrant I am applying for would permit law enforcement personnel to, with respect to every person who is located at the **SUBJECT PREMISES** during the execution of the search who is reasonably believed by law enforcement to be a user of a biometric sensor-enabled device that falls within the scope of the warrant: (1) depress the person's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of the face of the person with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

d. As set forth above, the **SUBJECT PREMISES** is a stash house used by multiple targets to store drugs and/or drug proceeds. I know, based on my training and experience, that, in order to protect valuable drugs and drug proceeds at a stash house, drug traffickers do not permit those who are uninvolved in the drug business to be at the stash house. In my training and experience, digital devices found in stash houses like the **SUBJECT PREMISES** may not have a clearly identifiable user based on the exterior of the device and/or may have multiple users whose biometric features may unlock the devices because drug traffickers share digital devices on which to coordinate drug trafficking and the laundering of drug trafficking proceeds. Thus, if while executing the warrant, law enforcement personnel encounter a digital device within the scope of the warrant that may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to, with respect to every person who is located at the **SUBJECT PREMISES** during the execution of the

search who is reasonably believed by law enforcement to be a user of a biometric sensor-enabled device that falls within the scope of the warrant: (1) depress the person's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of the face of the person with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

151. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

/ / /

/ / /

## VII. CONCLUSION

152. For all the reasons described above, there is probable cause to believe that the TARGETS have committed a violation of Title 21, United States Code, Section 841(a)(1) (Possession with the Intent to Distribute, and Distribution of, a Controlled Substance). Additionally, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the **Subject Offenses**, will be found at the **SUBJECT PREMISES**, as described in Attachments A-1 and A-2, and any digital devices found therein.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 6th day of May 2026.

THE HONORABLE STEPHANIE S. CHRISTENSEN
UNITED STATES MAGISTRATE JUDGE